**David GRANTHAM, Appellant,**

v.

**The STATE of Texas, Appellee.**

No. 12–00–00270–CR.

Court of Appeals of Texas,
Tyler.

Feb. 5, 2003.

Discretionary Review Refused
Sept. 10, 2003.

Clifton L. Holmes, Longview, for appellant.

Edward J. Marty, Tyler, for state.

Panel consisted of WORTHEN, C.J. and GRIFFITH, J.

## OPINION

### JAMES T. WORTHEN, Chief Justice.

David Grantham appeals his jury conviction for unlawful possession of a firearm by a felon. After finding him guilty, the jury assessed punishment at sixty years of imprisonment. In four issues, Appellant contends that the evidence is insufficient to support the conviction and that he received ineffective assistance of counsel. We affirm.

### BACKGROUND

#### State's Evidence

A fingerprint examiner testified, verifying the fact that Appellant was the man convicted of burglary of a habitation on October 9, 1991. Appellant's parole officer testified that, on December 23, 1999, he was released from prison on parole for the October 9, 1991 burglary of a habitation. He was to remain on parole until November 12, 2006.

Detective Anthony Dana, of the Smith County Sheriff's Department, explained that Appellant became known to him during his investigation of some burglaries in Smith County. He was also investigating Clifford Myers, Jimmy Allen, and Billy Johnson. Both Appellant and Johnson had outstanding arrest warrants. On January 5, 2000, Detective Dana and other officers set up surveillance at a house in a wooded area on Highway 155 where the burglary suspects were residing. They continued to watch the house on January 6. When they decided to enter the house, they knocked on the door and loudly identified themselves for ten to fifteen minutes. The door was standing slightly open, but no one answered. The officers went in and immediately arrested Johnson, who was in the kitchen. Appellant, who was in the bathroom, resisted arrest, telling the officers to get out of his house because they had no business there. Detective Dana saw audio and video surveillance equipment both inside and outside the residence. He explained that there were security cameras mounted on the outside of the house that were connected to a television inside the house. Also, there were motion detectors on each side of the driveway. They found miscellaneous items such as police scanners, walkie-talkies, and CB radios. He saw a shotgun in plain view on the floor in front of the couch. A shoulder holster and a bag of ammunition were found close to Appellant. Additionally, they found a large quantity of ammunition in the house.

Don Burleson testified that he lives on County Road 3147 and that Jimmy Allen is his neighbor. Burleson is retired and spends most of his time at home. He explained that during late fall 1999 and January 2000, he heard gunshots at all hours of the day and night, mostly in the "wee hours of the morning." The noise came from Allen's backyard where there were flood lights. He heard gunshots there two or three times a week for between ten minutes and two hours at a time. Burleson called the sheriff's department to complain of the noise. He knew of four males staying at Allen's, including Appellant. Burleson specifically testified that he saw Appellant behind Allen's house shooting guns "in the last three months there off and on" up to December 1999 or January 2000. On cross-examination, Burleson said the shooting stopped after or around December when they moved and were arrested. He was not certain of the date, although it was somewhere around Christmas, but he stated that the day they moved out "the shooting quit."

Jimmy Allen testified, explaining that he had a home on County Road 3147. In the late fall of 1999, Appellant and his girlfriend, Rainey Rounsavall, moved in with

him. He testified that Appellant brought a shotgun to his house that fall, in October, November, or December. Usually, the gun was in Appellant's bedroom when he was home and he carried it with him when he left the house. Appellant also had a pistol like the one pictured in State's Exhibit 21. He had a shoulder holster and he carried the pistol with him during the time he lived with Allen. Allen first saw Appellant with that pistol and a .22 revolver around the middle of December 1999. Appellant shot the .22 in Allen's backyard, aiming at a target on plywood. Allen also stated that Appellant shot the shotgun up in the trees and in the woods behind his house all the time in the fall of 1999. Moreover, toward the end of December, because Allen had yelled at Rounsavall for leaving her dog in the house for an extended period of time, Appellant had threatened Allen by putting a gun under Allen's chin.

Allen testified that neighbors had complained about gunfire at his house. He observed Appellant and Billy Johnson fire weapons but he did not shoot any guns himself. He saw Appellant in possession of three different handguns and a shotgun. He said Appellant had a gun on him most of the time, in a green shoulder holster. After Appellant threatened him in late December, Allen "told him that he had to get his people and get all of his stuff out of the house." He did not call the police to report the threat "because there was a lot of stolen property" at his house.

On cross-examination, Allen explained that Clifford Myers, who was his ex-wife's nephew, had introduced him to Appellant. Myers also lived at Allen's house part of the time. Johnson and Rounsavall lived there during the same time period. On December 27, Allen talked to Detective Gerald Caldwell, who asked him if Appellant had brought any stolen guns onto Allen's property. Allen told him no because he thought the guns belonged to Appellant. He admitted that he had initially lied to law enforcement officers, denying any knowledge of stolen property, but explained he wanted to shield all involved because Appellant had threatened his life. Allen stated that he did not own any guns, Johnson had some guns at his house, and Appellant brought the shotgun to Allen's house. He last saw Appellant on December 26, 1999, and there have been no guns at Allen's house since Appellant left.

Detective Gerald Caldwell, with the Smith County Sheriff's Department, was involved in burglary and theft investigations. On January 6, 2000, he went to a residence on Highway 155 to serve an arrest warrant on Appellant. He explained that Appellant was arrested in a bathroom a few feet from a gun locker. Additionally, he found a loaded pistol in a closet area a couple of feet from where Appellant was arrested. He testified that Appellant was fully dressed and not wet, resisted arrest, gave a false name, and threatened to kill the arresting officers. On cross-examination, Detective Caldwell said he did not see Appellant in possession of a firearm. But on redirect examination, he clarified that he did see Appellant a couple of feet from a gun.

### Defense's Evidence

Billy Johnson testified on Appellant's behalf. He was arrested on January 6, 2000 with Appellant, who he said was in the shower when the officers arrived. Johnson was charged with two burglaries, which, he said, Appellant was not involved in. He testified that Rounsavall usually kept the guns in a safe but when the officers arrived, the shotgun was under the couch. He did not know where the pistol was, although Rounsavall usually "carried it to work or something." He explained

that Cliff Myers brought the guns to Allen's house about two or three weeks before Christmas. He testified that Rounsavall was living in two different places and Appellant lived at Allen's house for only "a little bit, and then he went to Fort Worth five days out of the week." He and Rounsavall moved out of Allen's house on December 24. He explained that Appellant, who did not live there and stayed there only a night or two, was not there at the time he moved out. Johnson testified that he never saw the guns in Appellant's possession and he never saw Appellant shoot a gun. He further testified that his attorney told him that if he would testify against Appellant he would get ten year sentences in his burglary cases instead of twenty. He said he explained to his attorney that he could not do that because he never saw Appellant with guns or in control of guns. He rejected the offer and told his attorney, "I can't lie on this man." He was sentenced to twenty years of imprisonment for each of the burglary cases.

On cross-examination, Johnson explained that his attorney told him to lie to the jury and he would get a better deal. While he understands that there are no plea bargains in Judge Kent's court, he said the district attorney's office could plea bargain on his behalf. He then reiterated his earlier testimony that his attorney said if he would change his testimony or lie on the witness stand he would receive fewer years than if he told the truth. He stated that Appellant is his second cousin and he has known him all his life. Johnson testified that he had never seen Appellant with a gun in his hand and had never seen him fire a gun. He admitted to lying to law enforcement about his involvement in burglaries. He explained that he did not have a place to stay and sometimes Appellant would help him out by letting him stay at the house on Highway 155. He stated that Appellant did not live in that house but he

would ask permission from Rounsavall. He said that Appellant was in the shower when the officers arrived and his hair was wet. He never saw anyone fire guns at Allen's house. He explained that the surveillance equipment was for Rounsavall's safety, "because of her ex-old man." He spent ten to fourteen days at the house on Highway 155 while Appellant was there only one or two nights. As far as he knew, that house was rented by Rounsavall. Johnson agreed that he had previously admitted in a judicial proceeding to being a felon in possession of a firearm on January 6, 2000.

On redirect, Johnson explained that Rounsavall was in the hospital for about a week, beginning sometime after they moved to the house on Highway 155. He reiterated that the shotgun was kept under the couch and the handgun was kept in a safe.

Clifford Myers testified that he has known Appellant since high school and that Allen is his uncle by marriage. He said he never lived at Allen's house, but did stay there a few times. He denied ever bringing guns to Allen's house. He said he did see the shotgun at Allen's house but never saw the handgun. He also said he never saw Appellant with a gun. He explained that he did shoot guns at Allen's house but, when he did, Appellant would get mad or leave because he was not allowed to be around guns.

On cross-examination, Myers testified that Rounsavall would put the guns in her room. He said Appellant was not living at the house on Highway 155. He said that Rounsavall has a handgun and that Appellant did not shoot it. He did not see who took the shotgun to Allen's house; it was just out there. He said the shotgun sat in a corner in the living room. Then he said they usually kept it in a closet where the

washer and dryer was; then he said he did not know. He never saw anyone shoot the shotgun. He denied being afraid of Appellant. He told Detective Caldwell that Appellant did not want to go back to prison due to someone else's carelessness. He then said Appellant did not know Johnson and Myers were stealing. He also testified that Rounsavall carried a gun and large sums of money.

### State's Rebuttal Evidence

In rebuttal, the State recalled Detective Caldwell. He testified that Myers told him he would talk about anyone but Appellant because Myers was afraid Appellant might kill him. He said that Myers told him Appellant would be at the Highway 155 address and would probably have the security system on and "booby traps" set. Myers also said Appellant always carried a gun and that Appellant had told Myers he was not going back to jail. Detective Caldwell also testified that Johnson told him the house on Highway 155 belonged to Appellant and his girlfriend. On cross-examination, Detective Caldwell explained that the statements from Myers regarding Appellant's threat and about his possession of guns were not included in Myers' written statement of December 24, 1999 because these statements were made on January 4, 2000.

Detective Dana was also called in rebuttal. He testified that there was surveillance set up at the house on Highway 155. He was present when Myers said Appellant liked the location on 155 because it was secluded and could not easily be seen by other residences. Myers told them that Appellant would most likely have some type of security to warn him of approaching vehicles or persons. Further, he testified that Myers said Appellant is known to carry a handgun or would have it close by.

Finally, the State called William Wright, a lawyer representing Johnson. He testified that an assistant district attorney approached him about whether Johnson desired to testify in the case against Appellant, but no deal was offered because there are no plea bargains in Judge Kent's court. He stated that Johnson said he never saw Appellant with a gun and he would not testify against him. He also stated that no one from the district attorney's office attempted to have him tell Johnson to change his testimony or lie. The district attorney's office never indicated that if Johnson would lie or perjure himself, it would be to his benefit. The district attorney's office did indicate that if Johnson chose to cooperate in the prosecution of other cases, that could be taken into consideration when the district attorney argues for punishment. He reiterated that there was no deal in Johnson's case. On cross-examination he stated that the prosecutor would have recommended ten years if Johnson had testified for the State.

### LEGAL SUFFICIENCY

In his first issue, Appellant asserts the evidence is legally insufficient to support his conviction because the State failed to prove he had actual care, custody, control, or management of either of the firearms found in the house at the time of Appellant's arrest. He further asserts that the State presented no evidence that he acted intentionally with respect to the nature of his conduct or that it was his conscious objective or desire to possess the guns. In his third issue, Appellant asserts the trial court erred in denying his motion for instructed verdict because the evidence was insufficient as a matter of law to prove the allegations alleged in the indictment beyond a reasonable doubt. In his motion, he argued that there is no evidence that on January 6, 2000, he possessed a gun and

there is no evidence that the weapons were capable of being fired.

■ The standard for reviewing the legal sufficiency of the evidence is whether, viewing the evidence in the light most favorable to the jury's verdict, any rational trier of fact could have found beyond a reasonable doubt the essential elements of the offense charged. *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). The trier of fact is the sole judge of the weight and credibility of the witnesses and may believe or disbelieve any part of any witness's testimony. *Williams v. State,* 692 S.W.2d 671, 676 (Tex.Crim.App.1984). The jury is entitled to draw reasonable inferences from the evidence. *Benavides v. State,* 763 S.W.2d 587, 588–89 (Tex.App.—Corpus Christi 1988, pet. ref'd). A complaint about the denial of a motion for directed verdict is an attack upon the sufficiency of the evidence to sustain the conviction. *McDuff v. State,* 939 S.W.2d 607, 613 (Tex.Crim.App.1997).

■ To establish unlawful possession of a firearm by a felon, the State must show the accused was previously convicted of a felony offense and possessed a firearm after the conviction and before the fifth anniversary of his release from confinement or from supervision under community supervision, parole, or mandatory supervision, whichever is later. Tex. Pen. Code Ann. § 46.04(a)(1) (Vernon Supp. 2003). Possession is a voluntary act if the possessor knowingly obtains or receives the thing possessed or is aware of his control of the thing for a sufficient time to permit him to terminate his control. Tex. Pen.Code Ann. § 6.01(b) (Vernon 1994). As to the element of possession, the State must show the accused knew of the firearm's existence and that he exercised actual care, custody, control, or management over it. *See Ramirez v. State,* 897 S.W.2d 428, 436 (Tex.App.—El Paso 1995, no pet.).

The evidence used to satisfy these elements may be direct or circumstantial. *See Brown v. State,* 911 S.W.2d 744, 747 (Tex.Crim.App.1995). When the firearm is not found on the accused's person or is not in the accused's exclusive possession, additional facts must affirmatively link the accused to the contraband. *Nguyen v. State,* 54 S.W.3d 49, 53 (Tex.App.—Texarkana 2001, pet. ref'd).

Appellant focuses his argument on the two weapons found in the house on Highway 155 at the time of his arrest on January 6, 2000. Those weapons were not found on his person and several other people had access to the house. Accordingly, the evidence must affirmatively link Appellant to the firearms found at the house if the conviction rests on his possession of those weapons. *Id.* However, we need not address that question.

■ The indictment alleged that the offense occurred "on or about the 6th day of January, 2000." The State is not bound by the "on or about" date alleged in the indictment. *Walker v. State,* 4 S.W.3d 98, 104 (Tex.App.—Waco 1999, pet. ref'd). The State could prove a date other than the date alleged in the indictment where, as here, the date is anterior to the presentment of the indictment and within the offense's statutory limitation period. *Id.*

■ Jimmy Allen testified that Appellant brought a shotgun to his house in October, November, or December of 1999 and that Appellant usually carried a gun in a shoulder holster. Allen said that Appellant frequently shot at targets and trees in his backyard in the fall of 1999. He saw Appellant in possession of three different handguns and a shotgun while Appellant lived in his house. Don Burleson testified that he saw Appellant shooting guns at Allen's house in the latter part of 1999, up to December 1999 or January 2000. He

then said that Appellant and others staying at Allen's house moved out around Christmas and the shooting stopped. Accordingly, the State presented eyewitness testimony from two individuals who saw Appellant possessing and shooting guns in the three months immediately prior to the date alleged in the indictment. The fact that Appellant intended to possess the firearms can be inferred from his acts. *See McGee v. State,* 774 S.W.2d 229, 234 (Tex. Crim.App.1989) (op. on reh'g). Contrary to Appellant's argument, the State need not prove the weapons were capable of being fired. The law does not incorporate such a requirement. *Thomas v. State,* 36 S.W.3d 709, 711 (Tex.App.—Houston [1st Dist.] 2001, pet. ref'd). We conclude the evidence is legally sufficient to support the conviction and the trial court did not err in denying Appellant's motion for instructed verdict. *See Jackson,* 443 U.S. at 319, 99 S.Ct. at 2789; *McDuff,* 939 S.W.2d at 613. We overrule Appellant's first and third issues.

### FACTUAL SUFFICIENCY

In his second issue, Appellant asserts the evidence is factually insufficient to support his conviction. He complains that the record does not show he intentionally or knowingly possessed a firearm because one weapon was found in a closet and another was found in a different room than Appellant was in when he was arrested. Further, the weapons were not fingerprinted or even placed into evidence at trial.

 When reviewing the factual sufficiency of the evidence we consider whether a neutral review of all the evidence, both for and against the finding, demonstrates that the proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or the proof of guilt, although adequate if taken alone, is great-ly outweighed by contrary proof. *Johnson v. State,* 23 S.W.3d 1, 11 (Tex.Crim.App. 2000). We set aside the verdict only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis v. State,* 922 S.W.2d 126, 129 (Tex.Crim.App.1996). In conducting this analysis, our duty is to examine the trier of fact's weighing of the evidence. *Johnson,* 23 S.W.3d at 7. We consider all of the evidence in the record related to an appellant's sufficiency challenge, comparing the weight of the evidence that tends to prove guilt with the evidence that tends to disprove it. *See id.* However, because the jury is the sole judge of the facts, we must give deference to jury findings. *Cain v. State,* 958 S.W.2d 404, 407 (Tex. Crim.App.1997). What weight to give contradictory testimonial evidence is within the sole province of the jury because it turns on an evaluation of credibility and demeanor. *Id.* at 408–09. The jury may choose to believe some testimony and disbelieve other testimony. *Margraves v. State,* 34 S.W.3d 912, 919 (Tex.Crim.App. 2000).

 Again, Appellant would have us consider only the evidence of the weapons found in the house on Highway 155 on January 6, 2000. As explained above, both Burleson and Allen testified that they saw Appellant in possession of firearms during the three month period immediately preceding January 6, 2000. Additionally, the jury heard evidence tending to disprove guilt. Johnson testified that he had never seen Appellant in possession of any guns or shooting any guns and that Myers brought the guns to Allen's house. The jury was entitled to determine that Johnson lacked credibility and reject this testimony. *Cain,* 958 S.W.2d at 407. Myers also testified that he had never seen Appellant with a gun. Again, the jury could reject this testimony. *Id.* In rebuttal, De-

tective Caldwell testified that Myers had told him that Appellant always carried a gun. Detective Dana also testified that Myers said Appellant is known to carry a handgun or have it close by. Although defense witnesses presented testimony in direct conflict with the State's witnesses, we give deference to jury findings. *Id.* Reviewing all the evidence, we cannot say that proof of guilt is so obviously weak as to undermine confidence in the jury's determination, or that the proof of guilt is greatly outweighed by contrary proof. *Johnson,* 23 S.W.3d at 11. The jury's verdict is not so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Clewis,* 922 S.W.2d at 129. We overrule Appellant's second issue.

### INEFFECTIVE ASSISTANCE OF COUNSEL

In his fourth issue, Appellant asserts the trial court erred in failing to grant his motion for new trial which was based on a complaint of ineffectiveness of trial counsel. He contends that his trial counsel exhibited an actual conflict of interest when he advised Rainey Rounsavall, a witness favorable to the defense, to invoke her right to remain silent. He also claims that his attorney's failure to call as a witness the owner of the house on Highway 155 constitutes ineffective assistance. Further, he seems to complain that counsel should have called as a witness a detective who could testify that one of the guns in the house was stolen. Finally, he asserts that Rounsavall was threatened with prosecution if she testified for him.

We review the denial of Appellant's motion for new trial for abuse of discretion. *Melancon v. State,* 66 S.W.3d 375, 378 n. 3 (Tex.App.—Houston [14th Dist.] 2001, pet. ref'd) (op. on reh'g). The United States Supreme Court has established a two-part test, also adopted by Texas courts, to determine whether the representation of counsel was effective. The defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceedings would have been different. *Strickland v. Washington,* 466 U.S. 668, 687–88, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693 (1984); *Hernandez v. State,* 726 S.W.2d 53, 57 (Tex.Crim.App. 1986). Ordinarily, absent a showing of both prongs of the *Strickland* test, this Court cannot conclude that a defendant's conviction resulted from a breakdown in the adversarial process such that it rendered the result unreliable. *Strickland,* 466 U.S. at 687, 104 S.Ct. at 2064. However, certain claims of ineffective assistance of counsel involving conflicts of interest are controlled by *Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980).

Under *Cuyler,* a defendant demonstrates a violation of his right to reasonably effective assistance of counsel based on a conflict of interest if he can show that his counsel was burdened by an actual conflict of interest and the conflict had an adverse effect on specific instances of counsel's performance. *Id.,* 446 U.S. at 348–50, 100 S.Ct. at 1718–19. An actual conflict of interest exists if counsel is required to make a choice between advancing a client's interest in a fair trial or advancing other interests to the client's detriment. *Monreal v. State,* 947 S.W.2d 559, 564 (Tex.Crim.App.1997). Until a defendant shows his counsel actively represented conflicting interests, he has not established the constitutional predicate for his claim of ineffective assistance. *Cuyler,* 446 U.S. at 349–50, 100 S.Ct. at 1719. But if an appellant shows that a conflict of interest actually adversely affected the

adequacy of his counsel's representation, prejudice is presumed. *Id.*

■ Initially, we must review the record of the hearing on Appellant's motion for new trial to determine whether his trial counsel was burdened by an actual conflict of interest as Appellant asserts. Counsel explained that he had planned to call Rounsavall to testify that she had rented the house where Appellant was arrested. Counsel considered this to be exculpatory evidence. He testified that, before she took the stand, the prosecutor told him she would be prosecuted for theft of the stolen items in her house if she testified that it was her house. Counsel then told Rounsavall that she would be prosecuted if she testified; therefore, "it was risky to testify." Although he said he could not remember exactly what he told her, he testified that he did tell her that in his opinion it was in her best interest not to testify. On cross-examination, counsel specifically said it was not trial strategy for Rounsavall not to testify even though her testimony would have impeached Myers since her version of the origin of the guns conflicted with Myers' testimony. Counsel stated that he wanted her to testify. At trial, Rounsavall said she would invoke her Fifth Amendment right to decline to answer questions if called to testify. Counsel did not call her to the witness stand.

LaJuanda Lacy, Rounsavall's appointed counsel, testified at the hearing on Appellant's motion for new trial. She said that after speaking to the prosecutor, she advised Rounsavall not to testify at Appellant's trial. She explained that the prosecutor told her he could seek an indictment against Rounsavall. She specifically noted that he did not say that he would indict her, only that he could.

Rounsavall testified that she alone rented the house. She explained that the two weapons found in the house at the time of Appellant's arrest were collateral for a loan she made to Myers the previous November. She said Appellant did not have possession of those, or any other, guns and she never saw him shooting guns at Allen's house. She testified that both Appellant's counsel and Lacy advised her not to testify at the trial. However, on redirect by Appellant's counsel, she stated that she based her decision not to testify on what Appellant's counsel told her.

■ This record does not establish an actual conflict of interest. At no time did Appellant's trial counsel represent Rounsavall. He made comments to her regarding whether she should testify considering the circumstances. Her court appointed attorney was of the same opinion as Appellant's counsel. Although Appellant's counsel ultimately decided not to call Rounsavall, he maintained that he wanted her to testify because he thought she could provide exculpatory evidence for his client. It was Rounsavall's decision to invoke her Fifth Amendment privilege against self incrimination. Her constitutional privilege against self incrimination overrides Appellant's constitutional right to compulsory process of witnesses. *Ellis v. State*, 683 S.W.2d 379, 383 (Tex.Crim.App.1984). Further, Appellant did not have the right to have Rounsavall invoke the Fifth Amendment privilege in the presence of the jury. *Id.* Therefore, although Appellant's trial counsel did express his opinion to Rounsavall that testifying might lead to an indictment and he did choose not to call her to testify, these acts do not constitute making a choice between advancing Appellant's interest in a fair trial and advancing her interests. Appellant has not established that his counsel actively represented conflicting interests. Therefore, *Cuyler* does not apply and prejudice is not presumed. *Cuyler*, 446 U.S. at 349–50, 100 S.Ct. at 1719.

■ Applying the *Strickland* test, we now consider the remainder of Appellant's ineffective assistance arguments. We begin with a strong presumption that counsel's challenged actions were sound trial strategy. *Bone v. State*, 77 S.W.3d 828, 833 (Tex.Crim.App.2002). Claims of ineffective assistance of counsel must be supported by the record. *See Mercado v. State*, 615 S.W.2d 225, 228 (Tex.Crim.App. [Panel Op.] 1981).

■ If Rounsavall had testified at trial, she would have said she alone rented the house on Highway 155, she was holding the guns as collateral for a loan to Myers, and Appellant never possessed those guns or any other guns. The owner of the house would have testified that Rounsavall was the sole lessee. Ronald Duncan, a criminal investigator for the Rusk County Sheriff's Department, testified at the hearing that he recovered the shotgun found at the time of Appellant's arrest as part of an investigation into some Rusk County burglaries. He said Rounsavall told him she was holding the guns as collateral for a loan to Myers.

■ Rounsavall's explanation of the origin of the guns would have impeached Myers, possibly weakening Appellant's case. With the exception of Rounsavall's statement that Appellant was never in possession of any guns, the remainder of the proffered testimony is irrelevant and therefore inadmissible. Tex.R. Evid. 402. We do not fault counsel for failing to offer inadmissible evidence. Furthermore, ineffective assistance is not established where proffered testimony is not beneficial. *See Wilkerson v. State*, 726 S.W.2d 542, 551 (Tex.Crim.App.1986). With regard to Rounsavall's statement that she had never seen Appellant in possession of any guns, that testimony would have been duplicative of testimony by Appellant's two witnesses. Finally, that Rounsavall may have been

threatened with prosecution is a complaint of prosecutorial misconduct which does not implicate ineffectiveness of defense counsel. Appellant has not shown that trial counsel's representation fell below an objective standard of reasonableness. To the extent it may have been error not to have Rounsavall testify that she had never seen Appellant in possession of any guns, Appellant has not shown a reasonable probability that, had that statement been before the jury, the results of the proceedings would have been different. *Strickland*, 466 U.S. at 687–88, 104 S.Ct. at 2064. Therefore, Appellant has not shown that he received ineffective assistance of counsel and the trial court did not abuse its discretion in denying Appellant's motion for new trial. We overrule Appellant's fourth issue.

### CONCLUSION

The evidence is both legally and factually sufficient to support Appellant's conviction for unlawful possession of a firearm by a felon. Further, the trial court did not err in failing to grant Appellant's motion for new trial which was based on a claim of ineffective assistance of counsel. Therefore, we affirm the trial court's judgment.