# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-12-00050-CR

**Timothy Ray Aylesworth, Appellant**

**v.**

**The State of Texas, Appellee**

## FROM THE DISTRICT COURT OF COMAL COUNTY, 207TH JUDICIAL DISTRICT
## NO. CR2011-288, HONORABLE JACK H. ROBISON, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury convicted appellant Timothy Ray Aylesworth of the offenses of credit-card abuse (five counts), possession of a prohibited weapon, and unlawful possession of a firearm. Punishment was assessed at five years' imprisonment for each count of the credit-card-abuse offense, thirty-three years' imprisonment for the offense of possession of a prohibited weapon, and twenty years' imprisonment for the offense of unlawful possession of a firearm, with the sentences to run concurrently. In a single point of error, Aylesworth asserts that the evidence is insufficient to prove that the weapon he possessed was a firearm. We will affirm the judgments of conviction.

## BACKGROUND

Because Aylesworth does not challenge the sufficiency of the evidence related to his convictions for the offense of credit-card abuse, we will summarize only the evidence related to the weapons charges. The weapon that Aylesworth was alleged to have possessed was a short-barrel firearm, specifically a 12-gauge Remington shotgun, serial number D818180A, with a barrel length

of less than 18 inches. The jury heard evidence that on August 13, 2010, during the course of a theft investigation, officers with the New Braunfels Police Department executed a search warrant at a residence in which Aylesworth and his girlfriend, Natale Guzik, lived. Detective Jacob Pullen, the lead investigator in the case, testified that one of the items he found during the search of the residence was a sawed-off shotgun, which he described as follows:

> If everybody knows a regular shotgun with the stalk [sic] and the long barrel, if you imagine the part that comes down a little bit and then you have the stalk [sic] at the end cut off right about there (indicating) from the stalk [sic] and then the barrel cut off just in front of the fore-end, where you do the pump action of the shotgun, and it was black in color.

When asked if he had noticed any modifications to the weapon, Pullen testified, "It was obvious to me seeing a lot of shotguns. And the model of shotgun was the same model that we carry. And you could tell that the stalk [sic] had been cut and you could also tell that the barrel wasn't as long as it is legally required to be." Pullen later testified that the length of the barrel was approximately 13 inches. Pullen also specifically identified the weapon as a 12-gauge Remington Express Magnum shotgun, with a serial number of D818180A. Pullen further testified that the police had recovered four shells from inside the shotgun, including one shell that was "jammed in the chamber." Pullen was also asked whether the shotgun was operable. Pullen testified that in order for the shotgun to fire, it would need, at a minimum, "a firing pin, a way to make the firing pin engage and somewhere for the bullet to travel through so it can go to its course." However, Pullen admitted that he had not completely disassembled the weapon to determine if it contained a firing pin.[1]

---

[1] Pullen attempted to testify that, while later operating the weapon at the district attorney's office, he had "heard" a firing pin drop. However, Aylesworth objected to this testimony, and the district court sustained the objection and instructed the jury to disregard it.

Detective Trey Wahrmund of the New Branufels Police Department also investigated the case and provided testimony concerning whether the weapon was operable. Outside the presence of the jury, defense counsel had Wahrmund attempt to operate the shotgun. When the jury returned, the following testimony was elicited:

Q.   Detective Wahrmund, did you have a chance during the break to attempt to chamber a round into the shotgun in question in this case?

A.   I did.

Q.   And yes or no, were you able to load a round into the—into the shotgun?

A.   In its current physical state, if done manually as it was designed to, I would not be able to put a round into the chamber manually.

Q.   Best you know, that weapon has not been altered or adjusted in any way from the time that it was possessed by law enforcement. Correct?

A.   Correct.

On re-direct examination, the State elicited the following additional testimony on the matter:

Q.   And when you went out and did the demonstration with the—with the shotgun, did the firing pin drop the first time?

A.   It did.

Q.   After that you weren't able to get it to, were you?

A.   That's correct.

Q.   But the first time it did?

A.   That's correct.

Defense counsel then returned to the subject on re-cross examination:

Q.  Now, this—when you did this demonstration, the State mentioned something about you heard a firing pin drop the first time. Correct?

A.  Correct.

Q.  You are assuming that's what you heard. Correct?

A.  Yes.

Q.  There are other moving parts in that weaponry, isn't there?

A.  That's correct, there are other moving parts.

Q.  And the fact of the matter is even if maybe you had heard what would be considered a firing pin, it was nowhere in the location of the chamber had that chamber been loaded with a live round. Correct?

A.  The sound that I heard was consistent with a sound of a hammer hitting a fire pin coming from—

Q.  I understand. But that's not the question. The question is if you did hear a firing pin, in its current state, it would not have fired a live round. Correct?

A.  If it hit a firing pin and there was a round against that bolt, it could have detonated the primer.

Q.  That's not what I asked. You are saying if this and if that. And that demonstration that you did, when you had tried to chamber or tried to slide the little cock deal and you—you heard the—what you think was a firing pin, that firing pin was three inches away from the location where a shell would have been chambered. Isn't that correct?

A.  That is correct.

Q.  And you were never able to get that firing pin any closer than maybe three inches, a big opening. Correct?

A.  Correct.

Q.  So in the current state that weapon would not have fired a round, live round?

A.  Not as it is designed, no.

Q.  Just as what has been elicited by the defense in this case. Correct?

4

A.    Correct.

. . . .

Q.    How much time did you spend trying to get that weapon to function?

A.    About five minutes.

Q.    And you sat there diligently trying to slide that and maneuver it and get it to function.  Correct?

A.    I did.

Q.    To the best of your knowledge, that weapon had not been altered or adjusted since the time it was in law enforcement's possession.  Correct?

A.    Correct.

During the course of the investigation, Detective Pullen had a phone conversation with Aylesworth, an audio recording of which was admitted into evidence.  During the conversation, Aylesworth admitted that the weapon belonged to him and that he had cut off the barrel of the weapon and painted the gun black to make it look more intimidating.  He also claimed that the weapon was loaded with ammunition just for "looks."  In a subsequent interview with Pullen at the police station, a video recording of which was admitted into evidence, Aylesworth stated that he owned the shotgun for "protection" but claimed repeatedly that it was not capable of firing.[2]  When Pullen confronted Aylesworth with the fact that the gun was loaded at the time it was found, Aylesworth responded, "I'm an ex-con that was used to a lot of excitement."[3]

---

[2] Kathleen Martin, the mother of Aylesworth's girlfriend, who testified for the defense, made a similar claim in her testimony that the "gun didn't fire."

[3] The jury heard evidence that Aylesworth had a prior conviction for the felony offense of aggravated robbery.

5

The jury found Aylesworth guilty of both possession charges, and punishment was assessed as noted above. This appeal followed.

**STANDARD OF REVIEW**

Due process requires that the State prove, beyond a reasonable doubt, every element of the offense charged. *See Jackson v. Virginia*, 443 U.S. 307, 313 (1979). The sufficiency of the evidence is measured by reference to the elements of the offense as defined by a hypothetically correct jury charge for the case. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009). When reviewing the sufficiency of the evidence to support a conviction, we consider all of the evidence in the light most favorable to the verdict to determine whether any rational jury could have found the essential elements of the offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319. We must consider all the evidence in the record, whether direct or circumstantial or properly or improperly admitted. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We assume that the jury resolved conflicts in the testimony, weighed the evidence, and drew reasonable inferences in a manner that supports the verdict, and we defer to the jury's determinations of the witnesses' credibility and the weight to be given their testimony. *Jackson*, 443 U.S. at 318; *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton*, 235 S.W.3d at 778; *see* Tex. Code Crim. Proc. art. 38.04.

**ANALYSIS**

In his sole point of error, Aylesworth asserts that the evidence is insufficient to prove that the weapon he was charged with possessing was a firearm. Specifically, he asserts that

6

the weapon was not a firearm because the evidence tended to show that the firearm was inoperable at the time it was found in Aylesworth's possession.

Aylesworth was charged with unlawful possession of a firearm and possession of a prohibited weapon. A person commits the offense of unlawful possession of a firearm if he possesses a firearm after being convicted of a felony and before the fifth anniversary of the person's release from confinement following his conviction. Tex. Penal Code § 46.04(a)(1). A person commits the offense of possession of a prohibited weapon if he possesses a short-barrel firearm. *Id*. § 46.05(a)(3). For purposes of these statutes, a firearm is defined as "any device designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use." *Id*. § 46.01(3). A "short-barrel firearm" is further defined as a shotgun with a barrel length of less than 18 inches. *Id*. § 46.01(10).

Here, Detective Pullen testified that the shotgun was loaded with ammunition at the time that it was found, that one of the shotgun shells was "jammed in the chamber," that the shotgun had a barrel that was "cut off just in front of the fore-end, where you do the pump action of the shotgun," and that the shotgun was similar to the type of weapon that police officers use. From this and other evidence, the jury could have reasonably inferred that the weapon found in Aylesworth's possession was "designed, made, or adapted to expel a projectile through a barrel by using the energy generated by an explosion or burning substance or any device readily convertible to that use." Pullen also testified that the shotgun had a barrel that was approximately 13 inches in length, and the jury could have reasonably inferred from this and other evidence that the weapon met the statutory definition of a "short-barrel firearm." As for Aylesworth's contention that the firearm was

"inoperable," there is no requirement in either of the above statutory definitions that the weapon be operable or capable of being fired, and numerous cases have so held. *See, e.g.*, *Walker v. State*, 543 S.W.2d 634, 637 (Tex. Crim. App. 1976) (finding automatic pistol to be "firearm" even though clip and pin may have been missing at time of offense); *Hutchings v. State*, 333 S.W.3d 917, 922 (Tex. App.—Texarkana 2011, pet. ref'd) ("It is not necessary for the State to prove a firearm is operable."); *Bollinger v. State*, 224 S.W.3d 768, 775 (Tex. App.—Eastland 2007, pet. ref'd) (observing that such requirement would "overstate the State's burden"); *Grantham v. State*, 116 S.W.3d 136, 144 (Tex. App.—Tyler 2003, pet. ref'd) ("Contrary to Appellant's argument, the State need not prove the weapons were capable of being fired. The law does not incorporate such a requirement."); *Thomas v. State*, 36 S.W.3d 709, 711 (Tex. App.—Houston [1st Dist.] 2001, pet. ref'd) ("Even if the clip and firing pin are missing at the time of the offense, a pistol is still a firearm under Section 46.01(3)."); *Lewis v. State*, 852 S.W.2d 667, 669 (Tex. App.—Houston [14th Dist.] 1993, no pet.) (holding that State was not required to prove that weapon was capable of firing in prosecution for unlawful possession of short-barrel firearm). Although Aylesworth attempts to distinguish some of the above cases from the facts of this case, his efforts are unavailing. This case, like the others cited above, involved a weapon that, based on the evidence presented, might not have been capable of firing. But that is not an element of the State's burden of proof here.[4] Viewing the evidence and all reasonable inferences therefrom in the light most favorable to the verdict, we conclude that the evidence is sufficient to prove that the weapon Aylesworth possessed was a firearm. We overrule Aylesworth's sole point of error.

---

[4] In fact, the court's charge specifically instructed the jury that "[t]he law does not require that a firearm be operable."

**CONCLUSION**

We affirm the judgments of the district court.

_____

Bob Pemberton, Justice

Before Justices Puryear, Pemberton, and Rose

Affirmed

Filed:   July 24, 2013

Do Not Publish